UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARSHALL A. STULL**,                              Case No. 1:09 CV 2379

      Plaintiff,                              Judge Sara Lioi

      v.                              REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                              Magistrate Judge James R. Knepp II

### Introduction

Plaintiff Marshall Stull appeals the administrative denial of supplemental security income benefits (SSI) under 42 U.S.C. § 1383. The district court has jurisdiction under 42 U.S.C. § 1383(c)(3).

This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### Background

From May 2003 through June 2005, Plaintiff saw family practice physician Jessica Griggs, D.O., for his routine health concerns. (Tr. 256-94). He reported a thirteen to fourteen year history of asthma and indicated he was using a friend's albuterol for treatment. (Tr. 267). He also reported he smoked one-half pack of cigarettes per day and he had quit using crack cocaine two years prior. (*Id.*). In November 2003, Plaintiff reported he continued smoking one-half pack of cigarettes every day. (Tr. 274). In October 2004, he again reported his continued smoking. (Tr. 282).

In late July 2003, Plaintiff saw A.K. Bhaiji, M.D. for a consultative physical examination

at the request of the state agency.  (Tr. 296-303).  Plaintiff reported to Dr. Bhaiji that his only medical problem was asthma.  (Tr. 296).  In the course of examining Plaintiff, Dr. Bhaiji observed his lungs to be clear to auscultation, with no rales, rhonchi, or wheezing, and with normal excursions without an increase in AP diameter.  (Tr. 297).  Dr. Bhaiji's examination was otherwise normal, with no motor or sensory abnormalities; no tenderness in Plaintiff's neck, mid-back, or low-back; negative straight leg raising; normal grip/grasp/manipulation/pinch/fine coordination in both hands; normal range of motion throughout; and normal gait.  (*Id.*).  Dr. Bhaiji concluded Plaintiff would not have difficulty with work-related physical activities such as sitting, standing, walking, lifting, or carrying and handling objects.  (Tr. 298).  Chest x-rays taken that day showed no definite acute cardiopulmonary changes.  (Tr. 299).

In September 2004, state agency physician Maria Congbalay, M.D., reviewed the record and opined that Plaintiff had no exertional, postural, or manipulative limitations but that he should avoid even moderate exposure to fumes, odors, dusts, gases, or poor ventilation.  (Tr. 305-09).  In May 2005, another state agency physician reviewed the record and concurred with this assessment.  (Tr. 351-58).

In November 2004, Plaintiff reported to consultative psychologist Ronald Smith, Ph.D., that he liked to shoot pool once a week and that he tried to help out with cleaning, mowing the grass, and going to the store occasionally.  (Tr. 311-12).

A few months before filing the instant SSI application, on January 7, 2005, Plaintiff reported to emergency room doctors that he had asthma flare-ups approximately every six months.  (Tr. 206). The record shows he had an asthma flare-up on January 7, 2005, with severe wheezing and labored breathing.  (Tr. 205-06).  His history noted he was a smoker.  (Tr. 206).  With treatment, he was

2

dramatically better and was discharged.  (Tr. 207).  Plaintiff returned to the emergency room the next day with similar symptoms after he had taken SoluMedrol in the early afternoon the day before, but did not use prednisone until the next morning.  (Tr. 217-19).  The attending physician indicated hospitalization was not necessary; he was noted to be doing "extremely well" with treatment, and was discharged.  (Tr. 219).

Later in January 2005, Plaintiff reported to Dr. Griggs low-back, chest, and foot pain but that Vicodin had helped.  (Tr. 287).  Dr. Griggs gave him another Vicodin prescription.  (*Id.*).

In March 2005, Dr. Griggs found Plaintiff to be non-tender to palpation of his lumbar spine with full range of motion.  (Tr. 291).  Dr. Griggs gave Plaintiff another prescription for Vicodin, but indicated that she was referring him to pain management and would be prescribing "[n]o more Vicodin".  (*Id.*).

An April 2005 chest x-ray showed slight hyperinflation of Plaintiff's lungs, which was compatible with his history of bronchial asthma, but showed no evidence of active disease in his chest.  (Tr. 293).

In June 2005, Plaintiff saw Dr. Griggs for a follow-up office visit.  (Tr. 294).  Plaintiff reported he had no asthma attacks since last seeing Dr. Griggs three months before, but reported he continued to smoke.  (*Id.*).  He indicated his knees were beginning to "pop and hurt" but that he had not followed up with the pain management clinic as he had been instructed to do.  (*Id.*).  Dr. Griggs again advised Plaintiff to go to a pain management clinic and gave him another prescription for Vicodin.  (*Id.*).

In August 2005, Plaintiff went to his local emergency room for an asthma exacerbation.  (Tr. 370).  He was treated, advised to stop smoking and to see Dr. Griggs for follow-up.  (Tr. 376).

3

From January 2006 through May 2007, Plaintiff saw Mary Wynn, M.D., for complaints of bilateral upper extremity numbness and tingling, back pain, and routine follow-up for asthma. (Tr. 279-88). Dr. Wynn ordered a series of diagnostic tests and later in January 2006, Plaintiff had a cervical x-ray which showed mild left-sided neural facet arthropathy without fracture. (Tr. 415). In March 2006, Dr. Wynn noted Plaintiff continued to smoke. (Tr. 387). She advised Plaintiff that he needed to quit smoking. (Tr. 387). In May 2006, Dr. Wynn advised Plaintiff: "[I]f he quit smoking, [his asthma] might not be such a significant problem for him". (Tr. 386). At that time, Plaintiff reported he quit smoking a month prior and he was able to exercise three times a week with his friends, was lifting weights, and was able to run up to one and a half miles, but if he ran much more than that, he would develop shortness of breath and wheezing. (*Id.*). Due to Plaintiff's complaints of neck pain, Dr. Wynn referred him for a course of physical therapy. (Tr. 385).

In September 2006, Plaintiff reported he was smoking again (Tr. 383), and again, Dr. Wynn advised him he needed to quit. (Tr. 384). Later in September 2006, Plaintiff had a cervical magnetic resonance imaging (MRI) exam which showed (1) superior end plate vertebral body changes at C7, which were not acute in appearance, and (2) no disc herniations, spinal canal or neuroforaminal stenosis. (Tr. 409).

Later in September 2006, Plaintiff presented to his local emergency room with an asthma exacerbation with acute bronchitis. (Tr. 439). He was admitted, given intravenous antibiotics, and responded very well. (*Id.*). While in the hospital, Plaintiff underwent a chest x-ray which showed no active chest disease. (Tr. 408). He was advised to follow-up with Dr. Wynn. (Tr. 439).

In October 2006, Plaintiff saw Dr. Wynn. (Tr. 382). He told Dr. Wynn that he had quit smoking five days before the appointment. (*Id.*). Dr. Wynn then prescribed NicoDerm patches for

Plaintiff.  (*Id.*).

In November 2006, nerve conduction studies of Plaintiff's bilateral arms and wrists were normal.  (Tr. 403-04).  However, later in November 2006, Plaintiff again complained of bilateral upper extremity numbness and tingling.  (Tr. 381).  Dr. Wynn noted Plaintiff's negative cervical MRI results and x-rays.  (*Id.*).  Also in November 2006, Plaintiff underwent a chest x-ray which showed no acute disease nor significant change since his September 2006 chest x-rays.  (Tr. 399).

Later in November 2006, Plaintiff presented to his local emergency room with an asthma exacerbation.  (Tr. 420).  He was treated with intravenous steroids and was discharged the next day "much, much improved" with minimal expiratory wheezes.  (*Id.*).  He was advised to follow-up with Dr. Wynn.  (*Id.*).

In March 2007, Plaintiff presented to his local emergency room with an asthma exacerbation where he was treated and released.  (Tr. 430-38).  Later in March 2007, Plaintiff advised Dr. Wynn that after his last hospitalization for an asthma exacerbation, he was ready to quit smoking "cold turkey."  (Tr. 380).  He indicated he realized smoking was negatively impacting his health.  (*Id.*).  He also reported bilateral hand pain and wanted to know what could be done for that pain.  (*Id.*).  Dr. Wynn ordered x-rays of Plaintiff's hands and advised him to return in one month.  (*Id.*).

In May 2007, Plaintiff reported his hands had been sore as of late, he had difficulty closing them, and they felt numb in the mornings.  (Tr. 379).  He requested an evaluation.  (*Id.*).  Dr. Wynn examined him, and observed his lungs sounded normal, and his hands had good functional range of motion with good strength.  (*Id.*).  Dr. Wynn also noted his upper extremity EMGs were normal as was his cervical MRI, which showed no abnormalities.  (*Id.*).  On the same day, bilateral hand x-rays showed Plaintiff had no significant arthritic changes.  (Tr. 389).

5

## Standard of Review

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## Standard for Disability

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination

6

of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four.  *Walters*, 127 F.3d at 529.  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy.  *Id.*  The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work.  *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled.  20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**Discussion**

Plaintiff raises three issues:

1.      Whether the ALJ properly considered Plaintiff's failure to quit smoking in the face of repeated advice from his physicians to do so;

2.      Whether substantial evidence supports the ALJ's residual functional capacity (RFC) finding; and

3.      Whether the ALJ properly assessed Plaintiff's complaints of pain and hand numbness.

(Doc. 11, at 4-10).  For the reasons discussed below, these issues do not provide Plaintiff relief.

*Failure to Quit Smoking*

7

Plaintiff argues the ALJ's finding that his failure to follow through with treatment recommendations to quit smoking was erroneous and contrary to law.  (Doc. 11, at 4-7).  Plaintiff is incorrect.

Plaintiff concedes he was repeatedly told to quit smoking.  (*Id.* at 5-6).  But he claims that while he was often told to quit smoking by his doctors, that was advice and "not a formal prescription."  (*Id.* at 5).  Plaintiff is playing semantics here: a "prescription" for quitting smoking is no different from a doctor advising a patient to quit smoking.  If a patient wants to improve his health, he should follow the doctor's treatment recommendations; smoking cessation is no different.  This is especially true if, as here, the treatment recommendation is for an impairment that a claimant alleges causes disabling limitations.  *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (Court took judicial notice of large body of medical opinions correlating smoking and health problems).

Plaintiff further admits that "the record indicates that doctors expected a significant improvement in the frequency and/or severity of [his] asthma attacks if he were to stop smoking." (Doc. 11 at 6).  But Plaintiff argues that while doctors expected significant improvements, no doctor opined that it would allow him to perform substantial gainful activity.  (*Id.*)  Plaintiff fails to mention, and as the ALJ correctly noted,  no doctor of record found Plaintiff to be disabled from working, even when he was smoking.  (Tr. 17).  Instead, the only medical source opinions addressing Plaintiff's ability to work (from consultative examiner Dr. Bhaiji and state agency physician Dr. Congbalay) found Plaintiff to have no exertional limitations.  (Tr. 299, 305-09).  Further, Plaintiff's treating physician Dr. Wynn noted that after Plaintiff quit smoking for a month, he was able to exercise three times a week with his friends, lift weights, and run up to one and a half

8

miles. (Tr. 386). Contrary to Plaintiff's suggestions, this activity is consistent with the ability to perform at least the work tasks necessary for the light and sedentary jobs the vocational expert identified as consistent with the ALJ's RFC finding. Plaintiff has not shown otherwise. *See* 20 C.F.R. § 416.912 (burden of proof and of evidence is on claimant to prove he is disabled).

Moreover, Plaintiff's failure to quit smoking in the face of repeated instructions otherwise, was only one example of treatment non-compliance properly considered by the ALJ. (Tr. 14); *see* 20 C.F.R. § 416.929(c)(3)(v) (in evaluating the severity of a claimant's pain and other symptoms, the ALJ must consider what treatment a claimant has undergone for relief of his pain or symptoms). The ALJ found other examples of treatment non-compliance detracting from the credibility of Plaintiff's allegations of disabling symptoms. (Tr. 14). For example, the ALJ noted Plaintiff had abused his albuterol inhalers, causing one doctor to discharge him from further care for "non-compliance" and abuse of his albuterol inhalers. (Tr. 14, 196). The same doctor's office noted Plaintiff tried to obtain duplicate prescriptions for an albuterol inhaler from two different doctor's offices under false pretenses – evidence suggestive of drug-seeking behavior. (*Id.*). Similarly, the ALJ also noted one doctor documented Plaintiff was using a friend's albuterol. (Tr. 14, 267). Thus, all of these examples of non-compliance with treatment recommendations detracted from the credibility of Plaintiff's statements that he was disabled by asthma or chronic obstructive pulmonary disease or both.

*RFC Finding*

The ALJ found Plaintiff to have the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: [Plaintiff] should avoid even moderate exposure to extreme heat or cold and should avoid concentrated exposures to fumes, odors, dusts,

9

gases, poor ventilation, etc.  He can do work involving simple, routine, tasks."  (Tr. 15) (internal citations omitted).

Plaintiff argues the ALJ's RFC finding was not supported by substantial evidence.  (Doc. 11, at 7-9).  But no doctor of record found Plaintiff to be disabled from working, even when he was smoking.  (Tr. 17).  And the only medical source opinions regarding Plaintiff's ability to work (from consultative examiner Dr. Bhaiji and state agency physician Dr. Congbalay) found Plaintiff to have no exertional limitations, consistent with the ALJ's RFC finding.  (Tr. 15, 298, 305-09). Significantly, other than when Plaintiff had acute exacerbations of asthma symptoms, which he indicated occur every six months (Tr. 206), the clinical and diagnostic findings regarding his breathing ability were relatively normal.  For example, Dr. Bhaiji made normal lung examination findings (no rales, no rhonchi, no wheezing, etc.).  (Tr. 297).  Similarly, chest x-rays repeatedly showed no acute changes or active disease.  (Tr. 293, 299, 408).

Moreover, Plaintiff's treating physician Dr. Wynn noted that after Plaintiff quit smoking for one month, he was able to exercise three times a week, lift weights, and run up to one and a half miles.  (Tr. 386).  Plaintiff told Dr. Wynn he had shortness of breath and wheezing if he ran <u>more</u> than a mile and a half.  (*Id.*).  Being able to run up to a mile and a half is consistent with the ability to perform at least the work tasks necessary for the light and sedentary jobs the vocational expert identified as consistent with the ALJ's RFC finding.  In light of every medical source opinion of record opining that Plaintiff had no exertional limitations and the mostly normal clinical and examination findings of record, the ALJ's RFC finding is supported by substantial evidence.  To give Plaintiff every benefit of the doubt, the ALJ ultimately restricted Plaintiff to light and sedentary work, consistent with Plaintiff's demonstrated ability to engage in activities at least as strenuous as

light and sedentary work.  Plaintiff has not shown otherwise.

*Pain and Hand Numbness*

Plaintiff's final argument claims the ALJ erroneously rejected Plaintiff's subjective claims of chronic pain and hand numbness.  (Doc. 11, at 9-10).  But, as the ALJ noted, Plaintiff's assertions are undermined by the complete lack of any clinical examination findings or diagnostic studies confirming arthritis or any other cause for Plaintiff's alleged symptoms.  (Tr. 13, 17).  For example, in July 2003, Dr. Bhaiji found Plaintiff to have normal strength, grip, grasp, manipulation, pinch, and fine coordination.  (Tr. 297).  He further found no motor or sensory abnormalities, and an exam of his neck, mid-back, and low-back was also normal.  (*Id.*).  Similarly, September 2006 cervical MRI and x-rays showed no abnormalities which would account for Plaintiff's allegations.  (Tr. 381, 409).  Likewise, November 2006 nerve conduction studies of Plaintiff's bilateral arms and wrists were normal.  (Tr. 379, 403-04).  Further, May 2007 bilateral hand x-rays showed no significant arthritic changes.  (Tr. 389).  In light of this overwhelmingly normal objective evidence, Plaintiff's subjective allegations can not be a basis for a disability finding.  *See* 20 C.F.R. § 416.929(a) (a claimant's statements about his pain or symptoms will not alone establish disability).

Plaintiff also suggests his use of narcotic pain medications confirms his condition was disabling.  But, as the ALJ found, although Dr. Griggs prescribed Plaintiff Vicodin for his pain complaints in January 2005, by March 2005 she advised him to go to a pain management clinic for further evaluation of his complaints and that she would be prescribing him "[n]o more Vicodin". (Tr. 17).  The record documents that Plaintiff did not go to a pain management clinic as Dr. Griggs advised him.  (Tr. 294).  The record also documents, as the ALJ notes, that Plaintiff advised Dr. Wynn that he had thrown away the Vioxx she prescribed for him.  (Tr. 282).  This evidence detracts

11

from Plaintiff's credibility as it suggests drug seeking behavior.  This is especially true in light of a previous doctor's discharge of Plaintiff from his care due to Plaintiff's attempt to obtain two prescriptions from two different medical sources at the same time.  (Tr. 196).  For all of these reasons, the ALJ reasonably did not give great weight to Plaintiff's allegations of pain and hand numbness.

## Conclusion and Recommendation

Following review of the arguments presented, the record, and applicable law, this Court finds the Commissioner's decision denying SSI benefits supported by substantial evidence.  The undersigned therefore recommends the Commissioner's decision be affirmed.

s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).